| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1696 EDA 2021 |

Appeal from the Order Entered July 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0003047-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1697 EDA 2021 |

Appeal from the Decree Entered July 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000488-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: S.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1698 EDA 2021 |

Appeal from the Order Entered July 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0003052-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: S.B.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S04046-22

                                    :
                                    :
                                    :
    APPEAL OF: A.M., MOTHER         :
                                    :
                                    :
                                    :
                                    :
                                    :   No. 1699 EDA 2021

Appeal from the Decree Entered July 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000489-2020

BEFORE:   BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED APRIL 4, 2022**

A.M. (Mother) appeals from the decrees and the orders,[1] each dated July 21, 2021, and entered on July 22, 2021, that granted the petitions filed by the Philadelphia Department of Human Services (DHS) to involuntarily terminate Mother's parental rights and to change the permanency goals from reunification to adoption for J.L.B. (Child), born in November of 2009, and S.M. (Child),[2] born in November of 2017 (collectively Children).[3]  After review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] By order, issued on September 22, 2021, this Court *sua sponte* consolidated these appeals because they involve related parties and issues.  **See** Pa.R.A.P. 513.

[2] S.M. is also identified as S.B.M.

[3] J.L.B.'s father is M.B.  S.M.'s father is R.M.  Each father's parental rights to their respective child were involuntarily terminated at the same time as Mother's rights were terminated.  Both fathers filed appeals to this Court. Their appeals are addressed in separate decisions.

In her brief, Mother sets forth the following issues for our review:

1. Did the [t]rial [c]ourt err or abuse its discretion in determining that Petitioner, … (DHS), had met its burden of proof by clear and convincing evidence that Mother evidenced a settled purpose of relinquishing her claim to the [C]hild[ren] or has refused or failed to perform parental duties, for at least six months immediately preceding the filing of the petition[?]

2. Did the [t]rial [c]ourt err or abuse its discretion in determining that Petitioner, DHS, had met its burden of proof that Mother has shown repeated and continued incapacity, abuse, neglect or refusal, or that such incapacity, abuse, neglect or refusal causing h[er] child[ren] to be without essential parental care, control or subsistence necessary for the [C]hild[ren]'s physical or mental well-being[?]

3. Did the [t]rial [c]ourt err or abuse its discretion in determining that Petitioner, DHS, had met its burden of proof that the conditions and causes or any such incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother[?]

4. Did the [t]rial [c]ourt err or abuse its discretion in determining that Petitioner, DHS, had met its burden of proof that the conditions which led to the removal o[f] the [C]hild[ren] continue to exist[?]

5. Did the [t]rial [c]ourt err or abuse its discretion in … determining that Petitioner, DHS, had met its burden of proof that the services or assistance reasonably available to Mother are not likely to remedy the conditions which led to the removal of the [C]hild[ren] within a reasonable period of time and erred or abused its discretion in determining that DHS made reasonable efforts to reunify this family[?]

6. Did the [t]rial [c]ourt err or abuse its discretion in … determining that Petitioner, DHS, had met its burden of proof that services or assistance were reasonably available to Mother[?]

7. Did the [t]rial [c]ourt err or abuse its discretion in … determining that Petitioner, DHS, had met its burden of proof that termination of Mother's parental rights best meets the needs and welfare of the [C]hild[ren?]

8. Did the [t]rial [c]ourt err or abuse its discretion in determining that Petitioner, DHS, had met its burden of proof that changing the [C]hild[ren]'s permanency goal[s] to adoption and terminating Mother's rights would best serve the needs and welfare of the child[?]

Mother's brief at 6-7.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if

the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

Since Mother's last issue concerns the trial court's decision to change the goal for Children to adoption, we address that issue by applying the following standard of review:

> In cases involving a court's order changing the placement goal … to adoption, our standard of review is abuse of discretion. *In re N.C.*, 909 A.2d 818, 822 (Pa. Super. 2006). To hold that the trial court abused its discretion, we must determine its judgment was "manifestly unreasonable," that the court disregarded the law, or that its action was "a result of partiality, prejudice, bias or ill will." *Id.* (quoting *In re G.P.-R.,* 851 A.2d 967, 973 (Pa. Super. 2004)). While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a "responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." *In re A.K.*, 906 A.2d 596, 599 (Pa. Super. 2006). Therefore, our scope of review is broad. *Id.*

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008).

Pursuant to the Juvenile Act, 42 Pa.C.S. § 6351(f), when considering a petition for goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the child; and (5) a likely date by which the goal for the child might be achieved. *In re S.B.*, 943 A.2d at 977. The best

interests of the child, and not the interests of the parent, must guide the trial court. *Id.* at 978.

We have reviewed the certified record, the briefs of the parties, the applicable law, and the extensive and comprehensive opinion authored by the Honorable Allan L. Tereshko of the Court of Common Pleas of Philadelphia County, dated October 8, 2021. We determine that Judge Tereshko's well-reasoned decision disposes of the issues raised by Mother. As for termination of Mother's parental rights, Judge Tereshko concluded that:

> DHS has provided clear and convincing evidence Mother continues the incapacity to parent. She lies and manipulates information and lacks the ability to anticipate problems related to parenting. She may have decided to terminate the abusive relationship with R.M. and may be on the path to a better life, nonetheless [J.L.B.] has clearly expressed she does not feel safe with Mother. Mother's conduct has caused these Children to be without essential parental care and she continues to be unable or unwilling to remedy this incapacity. These Children have been out of the parental home for more than six months and the conditions that led to the removal and placement continue to exist. Mother has complied with some [Family Service Plan] objectives, but whether she can remedy the conditions which led to the removal of the Children in the foreseeable future is doubtful. The Children's lives cannot be placed on hold in the hope that Mother will summon the ability to handle the responsibilities of parenting. This [c]ourt finds that although the Children may have a bond with Mother, this bond however is not a parent-child bond that should be preserved.

Trial Court Opinion (TCO), 10/08/2021, at 37-38.

With regard to his determination to change Children's goals to adoption, Judge Tereshko concluded:

> This [c]ourt finds the [r]ecord sustains the factual findings and legal conclusions regarding the Children's current placement, and

- 6 -

most importantly, the [r]ecord demonstrates that [r]eunification is not feasible and not in these Children's best interest. Competent, credible, persuasive evidence exists to change the [p]ermanency [g]oals of the Children from [r]eunification to [a]doption. Once [r]eunification is ruled out, the second preferred permanency option is [a]doption. Adoption has been clearly established as the appropriate goal in the best interest of these Children and is best suited to the safety, protection and physical, mental and moral welfare of these Children.

TCO at 42.

Because we conclude that Judge Tereshko's opinion properly disposes of the issues Mother raises in these appeals, we adopt Judge Tereshko's opinion as our own and affirm the decrees and orders appealed from on that basis.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/4/2022

- 7 -

**THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY**
**IN THE COURT OF COMMON PLEAS** 2021 OCT -8 AM 11: 18

| | |
|---|---|
| **IN THE INTEREST OF:** | : **FAMILY COURT DIVISION** |
| | : **JUVENILE BRANCH-Dependency** |
| | : |
| **J.L.B. a Minor** | : **CP-51-DP-0003047-2017** |
| **d/o/b: 11/●/2009** | : **CP-51-AP-0000488-2020** |
| | : |
| **S.M., a Minor** | : **CP-51-DP-0003052-2017** |
| **d/o/b: 11/●/2017** | : **CP-51-AP-0000489-2020** |
| | : |
| | : **Superior Court Nos.:** |
| **Appeal of:** | : **1696 EDA 2021; 1697 EDA 2021** |
| **A.M., Mother** | : **1698 EDA 2021; 1699 EDA 2021** |
| | : **CONSOLIDATED[1]** |

## OPINION

A.M. ("Mother"), Appeals from the <u>Decrees of Involuntary Termination of</u> <u>Parental Rights</u> and <u>Goal Change to Adoption</u> entered by this Court on July 21, 2021, granting the Petitions to Involuntarily Terminate her Parental Rights to the above referenced Children, filed by the Department of Human Services ("DHS") on December 31, 2020. Mother also Appeals this Court's Orders granting the Petitions for Goal Change also filed on December 31, 2020. In response to these Orders, Mother, by and through her counsel filed <u>Notices of Appeal with Statement of Errors Complained of on</u> <u>Appeal</u> on August 20, 2021.

Father, M.B., parental rights were involuntarily terminated as to J.L.B. on July 21, 2021, and Father filed Appeals on August 19, 2021, at 1685 and 1686 EDA 2021. Father,

---

[1] 09/22/2021, Consolidated Sua Sponte. Comment: Review of these matters indicates that these appeals involve related parties and issues. Accordingly, the appeals at Nos. 1696, 1697, 1698, and 1699 EDA 2021 are hereby CONSOLIDATED. See Pa.R.A.P. 513.

1

R.M., parental rights were involuntarily terminated as to S.M. on July 21, 2021, and he filed appeals on August 19, 2021, at 1683 and 1684 EDA 2021. Each of Fathers' appeals will be addressed in separate Opinions.

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matters Complained of on Appeal, Mother raises the following issues:

1. That the Trial Court erred or abused its discretion in determining that Petitioner, Department of Human Services (DHS), had met its burden of proof by clear and convincing evidence that Mother evidenced a settled purpose of relinquishing her claim to the child or has refused or failed to perform parental duties, for at least six months immediately preceding the filing of the petition.

2. That the Trial Court erred or abused its discretion in determining that Petitioner, DHS, had met its burden of proof that Mother has shown repeated and continued incapacity, abuse, neglect or refusal, or that such incapacity, abuse, neglect or refusal causing this child to be without essential parental care, control or subsistence necessary for the child's physical or mental well-being;

3. That the Trial Court erred or abused its discretion in determining that Petitioner, DHS, had met its burden of proof that the conditions and causes or any such incapacity, abuse, neglect or refusal cannot or will not be remedied by Mother;

4. That the Trial Court erred or abused its discretion in determining that Petitioner, DHS, had met its burden of proof that the conditions which led to the removal or the child continue to exist;

5. That the Trial Court erred or abused its discretion in the determining that Petitioner, DHS, had met its burden of proof that the services or assistance reasonably available to Mother are not likely to remedy the conditions which led to the removal of the child within a reasonable period of time

2

and erred or abused its discretion in determining that DHS made reasonable efforts to reunify this family;

6. That the Trial Court erred or abused its discretion in the determining that Petitioner, DHS, had met its burden of proof that services or assistance were reasonably available to Mother;

7. That the Trial Court erred or abused its discretion in the determining that Petitioner, DHS, had met its burden of proof that termination of Mother's parental rights best meets the needs and welfare of the child;

8. That the Trial Court erred or abused its discretion in determining that Petitioner, DHS, had met its burden of proof that changing the child's permanency goal to adoption and terminating Mother's rights would best serve the needs and welfare of the child.

## PROCEDURAL HISTORY:

A.M. (thereafter, "Mother") gave birth to daughter, J.L.B. on November●, 2009. M.B. (thereafter, "M.B.") is listed as Father on the Birth Certificate. (Exhibit "B" *Certification of Live Birth*, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020).

A.M. (thereafter, "Mother") gave birth to daughter, S.M. on November ●, 2017. R.M. (thereafter, "R.M.") is listed as Father on the Birth Certificate. (Exhibit "B" *Certification of Birth*, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020).

On October 31, 2017, DHS received a General Protective Services (GPS) Report alleging that on October 31, 2017, J.L.B., was referred by school staff to Children's Hospital of Philadelphia (CHOP) because she was limping and in pain; that J.L.B. was diagnosed with recent extensive bruising and old linear hyperpigmentation on the backs of her legs; that the Children's Mother, A.M., told CHOP staff that, since around

3

October 24, 2017, J.L.B. had jumped on a glass table with other children from church, had been hit repeatedly with a bat by another child, and fallen down steps; that S.M.'s Father, R.M., arrived at CHOP after Mother and J.L.B. had arrived; that R.M., was verbally aggressive with CHOP staff; that Mother and R.M., disagreed regarding J.L.B. jumping on the glass table and being hit with a bat by the unidentified child; that R.M. became enraged in the treatment room, repeatedly listing his various accomplishments that led to the decision to remove the child that was hitting J.L.B. from the church; that he stated "I am a man of God"; that he repeatedly requested a more intensive treatment plan for J.L.B.; that he appeared unable to understand what CHOP staff was attempting to explain to him; that he was further angered at the discussion of J.L.B.'s safety while in the home; that R.M. failed to calm himself and stated he would be taking J.L.B. to her primary care physician; that R.M. threatened legal action before leaving the treatment room; that R.M. stated that he would return in ten minutes if Mother was not outside within that time, insinuating that he would exhibit further explosive behavior; that CHOP staff contacted the primary care physician listed for J.L.B. and was informed that the family does not go there for treatment; that Mother appeared amenable to listening to CHOP's future treatment plan for J.L.B.; and that R.M. removed J.L.B. from CHOP against medical advice (AMA). This Report was determined as valid. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "a").

On November 1, 2017, DHS went to the family's home, but no one appeared to be at home. DHS left a letter requesting that Mother and R.M. contact DHS. (Exhibit "A"

4

Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "b").

On November 1, 2017, DHS telephoned R.M., who was extremely hostile during the telephone call. He told DHS that the agency has no authority to investigate the safety of J.L.B. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "c").

On November 2, 2017, DHS went to the family's home. DHS met with Mother and R.M. outside the home. DHS observed that R.M., stopped Mother from talking, stating that she should not be talking because she is pregnant. R.M., refused to allow DHS to have access to the home. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "d").

On November 3, 2017, Community Legal Services (CLS) telephoned DHS and stated that Mother and R.M., had attempted to retain CLS services as legal counsel; that CLS had explained the DHS investigation process to them and they were now willing to cooperate with DHS' investigation. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "e").

On November 3, 2017, DHS telephoned R.M., who agreed to a home visit on November 6, 2017. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "f").

On November 6, 2017, DHS went to J.L.B.'s school and met with her, who told DHS that on October 31, 2017, she was limping and in pain when she arrived at school because while she was at church, a three-year-old child had hit her on her leg with a bat and because she had fallen down stairs on October 31, 2017; that Mother did not stop the

5

child from hitting her with the bat; and that R.M., has a history of hitting her on her legs with drumsticks when she fails to do her chores. DHS observed a bruise and linear marks on the backs of her legs. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "g").

On November 6, 2017, DHS went to the family's home and met with R.M., who stated that on October 31, 2017, he had taken J.L.B. from CHOP against medical advice because he felt that he was being discriminated against by CHOP staff and that he took J.L.B. for a medical examination with her primary care physician at Delaware Valley Community Center on November 1, 2017. He denied hitting J.L.B. and told DHS that there were no drumsticks in the house. DHS met with J.L.B., who again stated that R.M., has a history of hitting her with drumsticks and that he had two sets of drumsticks, one in the home and one at the church. DHS observed a set of drumsticks in the dining room of the home. R.M. again denied hitting J.L.B. and stated that she has a history of not telling the truth and that he was no longer willing to be involved in her care. DHS met with Mother, who told DHS that she is the primary disciplinarian for J.L.B. and denied that R.M. had ever hit J.L.B. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "h").

On November 10, 2017, the October 31, 2017 GPS Report was upgraded to a Child Protective Services (CPS) Report. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "i").

On November 14, 2017, DHS learned that J.L.B. went to school that day and had a bruise on her left cheek. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "k").

6

On November 14, 2017, DHS went to J.L.B.'s school and met with her. DHS observed a bruise on J.L.B.'s left cheek. She stated that R.M. had hit her with his hand because she was misbehaving in the backseat of the family's automobile and that he had told her to tell DHS that no one had hit her. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "l").

DHS obtained an OPC for J.L.B. and S.M. on November 14, 2017. They were placed in a foster home through Children's Home of Easton (CHOE). (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "m").

A Shelter Care Hearing was held on November 16, 2017, before the Honorable Allan L. Tereshko. OPC was lifted and temporary legal custody transferred to DHS and placement in foster care through Children's Home of Easton. DHS to explore Family Finding. S.M., to have a full Child Abuse evaluation. Both Children safe as of 11/14/2017. (Shelter Care Order, 11/16/2017).

On December 12, 2017, The Community Umbrella Agency (CUA) Turning Points for Children (TP4C) held an Initial Single Case Plan (SCP) meeting. The parental objectives for Mother and R.M. were: 1) will attend parenting class and learn three non-physical forms of discipline; 2) attend and complete anger management class; 3) attend individual therapy; and 4) maintain contact with children per court order. Both parents appeared and participated in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "p").

7

On March 14, 2018, an Adjudicatory Hearing for S.M., was continued. The Court found that S.M., remained in a foster home through Children's Home of Easton and was safe as of 3/12/2018. (Continuance Order, 3/14/2018).

An Adjudicatory Hearing was held on March 14, 2018 for J.L.B., before the Honorable Allan L. Tereshko. The Child was found to be a Dependent Child. Legal Custody remains with DHS, and placement continues in foster care through Children's Home of Easton. Child J.L.B, found to be victim of child abuse as to Mother and stepfather, R.M. Reunification efforts must continue. Supervised visits as arranged, and parents are to have an additional 4 hours for visits. Child receives therapy through Children's Home of Easton. Mother and stepfather, R.M., referred to BHS for consultations and/or evaluations. Motion is granted allowing J.L.B.'s out of court statements to be admitted. Individual therapy to continue for the Child and family therapy incorporated when therapist deems appropriate. Mother and R.M., referred to ARC for parenting. (Order of Adjudication and Disposition, 3/14/2018).

On April 19, 2018, the Court deferred adjudication for S.M., as parents' counsel was not present and Court ordered Mother and Father, R.M., to receive forthwith Parenting Capacity Evaluations (PCE). (Continuance Order, 4/19/2018).

On May 8, 2018, adjudication of S.M. was deferred and hearing continued to allow parents to hire new counsel because they do not wish to continue being represented by current counsel. DHS to work with parents for visitation in accordance with work schedule. Both J.L.B. and S.M. are safe as of 4/18/2018. (Status Review Order, 5/08/2018) (Continuance Order, 5/08/2018).

8

An Adjudicatory Hearing was held for S.M., on June 27, 2018, before the Honorable Allan L. Tereshko. Child found to be Dependent Child and legal custody remains with DHS, and placement continues in foster care through Children's Home of Easton. Child is medically up to date and not receiving services. The parents hired private counsel to represent them jointly. Parents were referred for a PCE; that the parents were to complete parenting at ARC; and that the parents were to have weekly extended supervised visits at Agency and weekend overnight visits every other weekend from Saturday 10 a.m. until Sunday 7 p.m. CUA to do pop ups at the parent's home during weekend overnight visits. Father completed Anger Management. (Order of Adjudication and Disposition, 6/18/2018).

A Permanency Review Hearing for J.L.B. was held on June 27, 2018, before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement remains in foster care through Children's Home of Easton (CHOE). Mother to have supervised visits at Agency and stepfather, R.M., is not to be in the building when Mother is visiting with Child. Mother's home is appropriate and Mother attends ARC for parenting. CUA has had no contact with J.L.B.'s Father, M.B. Mother referred for PCE. Family therapy to be implemented when appropriate and Father to be included when appropriate. Mother has private counsel. Child safe as of 6/14/2018. (Permanency Review Order, 6/27/2018).

On September 20, 2018, CUA-TP4C held a revised SCP meeting. The parental objectives for Mother and R.M. were: 1) maintain contact with children per court order; 2) complete court ordered PCE and follow all recommendations; and 3) participate in family therapy when appropriate. Both parents appeared and participated in the SCP

9

meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "w").

On September 26, 2018, a Permanency Review Hearing was held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS and placement continues in foster care through C.H.O.E. for both Children. J.L.B., was recently moved to new foster care home. She receives trauma-based therapy and attends 3rd grade. IEP scheduled for 10/15/2018. Mother has weekly supervised visits with the Child at the Agency. Mother's last visit was July 2018. Stepfather, R.M., is NOT permitted to accompany Mother during her and Child's supervised visits. Mother is scheduled for PCE on 10/23/2018. All services for the Child are to continue. Mother to comply with the Child's therapist recommendations regarding beginning Family Therapy. S.M.'s parents have weekly supervised visits at the Agency and biweekly overnight unsupervised visits in their home. Visits are to continue as arranged. S.M., is up to date with medical and immunizations. S.M., does not receive any special services currently and is doing well. Mother and Father. R.M., are scheduled for PCE for 10/23/2018. Parents to comply with PCE, which is expedited. PCE is to examine the capacity of both siblings in a separate light. S.M., to be moved to the foster care home with her sibling, and all parties notified. Both Children safe as of 9/12/2018. (Permanency Review Orders, 9/26/2018).

A Permanency Review Hearing was held for S.M., on November 21, 2018, before the Honorable Allan L. Tereshko. Legal custody remains with DHS and placement continues in foster care through CHOE. Child attends daycare and is medically up to date. Parents to continue bi-weekly overnight visits and they may extend visits from the

10

weekend to Christmas, CUA to make arrangements. Child safe as of 11/07/2018. (Permanency Review Order, 11/21/2018).

On December 20, 2018, CUA-TP4C held a revised SCP meeting. The parental objectives for Mother and R.M. remained the same as the objectives given at the September 20, 2018 SCP meeting. Both parents attended and participated in the SCP meeting by telephone. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "z").

On January 2, 2019, a Permanency Review Hearing was held for S.M., before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placements remains in foster care at CHOE. Parents to have supervised visits at CHOE. Father to provide DHS with a copy of both Birth Certificates and Immigration Certificate and ordered a full FBI background to be obtained for Mother and Father. Child safe as of 12/06/2018. (Permanency Review Order, 1/02/2019).

On March 12, 2019, Permanency Review Hearing were held for both Children. Legal custody remains with DHS and placement continues in foster care at CHOE. J.L.B., is up to date with medical, dental and receiving therapeutic services. Mother to have weekly supervised visits with Child at Agency. Therapist, Marybeth Younger, is permitted to testify telephonically next court date. No changes to Child's therapy- PLS search for Child's Father. S.M., is up to date with medical and dental and scheduled to have tubes in ear on 3/25/2019, at Lehigh Valley Hospital. Parents signed consents. Children safe as of 2/14/2019. Parents hired new counsel. (Permanency Review Orders, 3/12/2019).

On May 8, 2019, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placements continue in foster care. Mother's visits with both Children shall be modified to every other week supervised by a visitation coach provided to CHOE. S.M.'s Father, R.M., visitation modified to every other week supervised by a visitation coach provided to CHOE. CUA to explore placement of siblings together. Current therapist for J.L.B., to remain. ACS to subpoena visitation coach for next court listing. Children safe as of 4/11/2019. (Permanency Review Hearing Orders, 5/08/2019).

On June 10, 2019, CUA-TP4C held a revised SCP meeting. The parental objectives for Mother and S.M.'s Father, R.M. remained the same as the objectives given at the September 20, 2018 SCP meeting. Both parents attended and participated in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "dd").

On August 28, 2019, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care. Visitation for Children with Mother to remain as status quo. Therapist report dated 8/27/2019. Mother and R.M., to resubmit for a PCE, for it to be expedited, and it to include Minnesota Multiphasic Personality Inventory. Mother to produce an original Divorce Decree as to M.B. Therapist for J.L.B., to appear in person or by phone at next court listing. Children safe as of 8/14/2019. (Permanency Review Orders, 8/28/2019).

On November 20, 2019, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and

12

placement continues in foster care through CHOE. Visitation for Children with Mother to remain as bi-weekly supervised visits at Agency. J.L.B., is attending Williams Township Elementary School and has an IEP. She is receiving individual therapy, however, family therapy was in place but has ceased. She is receiving tutoring services on a weekly basis. She is up to date with medical. PCE for Mother has not been scheduled as additional information is needed. Mother is not attending individual therapy at this time. Mother was recently arrested on 10/10/2019. Mother is currently employed by Signa Group Insurance. Father, R.M., to provide CUA with all necessary documents requested by Dr. Russell forthwith. R.M., was employed at Med Transit until 10/20/2019, but is currently employed by Uber. Both Children safe as of 11/15/2019. (Permanency Review Orders, 11/20/2019).

On January 22, 2020, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remained with DHS, and placement continued in foster care through CHOE. Visitation by Mother with both Children may be modified by agreement of the parties prior to next court date. Visitation by Father, R.M., with S.M., may be modified by agreement of the parties prior to next court date. Mother's Addendum to PCE completed 1/15/2020. CUA to explore family resources as identified today. Order amended to include Ms. Mills, or any non-authorized person is NOT to attend visits. (Permanency Review Orders—Amended, 1/22/2020).

On February 27, 2020, CUA-TP4C held a revised SCP meeting. The parental objectives for Mother were: 1) maintain contact with child per court order; 2) ensure that

the J.L.B.'s medical, dental and vision needs are met and keep all appointments; 3) participate in family therapy when appropriate; 4) sign all releases of information and consents; 5) ensure that the home remains appropriate and safe; 6) comply with the recommendation of the PCE; and 7) provide documentation of all completed court ordered services and expectations. Neither parent attended nor participated in the SCP meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition For Involuntary Termination of Parental Rights, filed 12/31/2020, ¶ "ii").

On September 3, 2020, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care through CHOE. J.L.B., is 10 years old and doing well in the home. She is enrolled at Williams Township Elementary School, her IEP is up to date, and her educational needs are being met. She is up to date with medical and dental and receives therapy. S.M., is 3 years old and doing well in the home and up to date with medical and dental. Mother to have on-site supervised visits with the Children, supervised by CHOE staff. Visits with Mother can be modified by agreement of the parties. CUA to make releases available for Mother's signature and therapist to provide treatment plan, progress report and attendance within 30 days. CUA to reach out to J.L.B.'s therapist, and CUA to assign SCP goals for her Father, M.B. Father to have virtual supervised visits with J.L.B., supervised by her therapist and at therapist's recommendation. County of jurisdiction to do complementary home evaluation of Father's residence. Court Administration to appoint legal counsel for J.L.B. Regarding S.M.'s Father, R.M., CUA to make releases available for Father's signature. R.M., to be compliant with CUA. R.M., to provide CUA with documentation of employment, work

14

schedule, therapist name, sign release and housing. Father, R.M.'s therapist to provide treatment plan, progress report and attendance within 30 days. (Permanency Review Orders, 9/03/2020).

On January 20, 2021, Permanency Review Hearings were held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and placement continues in foster care through New Foundation. All prior orders as to parents to stand. Visitation between S.M. and Father, R.M., shall be phone contact supervised by CHOE at Child's discretion. Children safe as of 1/14/2021. (Permanency Review Orders, 1/20/2021).

On March 9, 2021, at Status Review Hearing was held for S.M., before the Honorable Allan L. Tereshko. Remain as committed and placed. Father's in person visits are suspended. Father to have 1 hour supervised virtual visit a week. Stay Away Order issued to Father, R.M., to stay away from A.J. Cordi, Nicole Beauchamp, Jean Mazzarese, Beverly Pearson and the Children's Home of Easton located at 2000 S. 25th St., Easton, PA 18042. (Status Review Order, 3/09/2021).

On April 22, 2021, a Permanency Review Hearing was held for both Children before the Honorable Allan L. Tereshko. Legal custody remains with DHS, and J.L.B.'s placement shall remain in a Pre-Adoptive Home through CHOE. S.M.'s placement to remain in foster care through CHOE. Children to remain as committed. All attorneys to submit their closing arguments in writing to the Judge within 30 days and to be emailed to the Court. The cases are held under advisement and the Court will render a decision. Child safe as of 4/21/2021. (Permanency Review Order, 4/22/2021).

15

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T. 91 A.3d 197 Pa.Super.2014).*

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

16

**The Trial Court Properly Found that DHS had met its Burden by Clear and Convincing Evidence to Involuntarily Terminate Mother's Parental Rights Pursuant to 23 Pa.C.S.A. §2511 (a)(2), (5) (8) and 2511 (b)** [2]

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, DHS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.*, 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-04 (Pa.1989).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is

---

[2] **23 Pa.C.S.A. §2511 (a) General Rule.**—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties. (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. (5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. (8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

**23 Pa.C.S.A. §2511 (b). Other Considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

17

on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.,* 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

Mother alleges this Court committed reversible error when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing evidence under 23 Pa.C.S.A. §§2511 (a) (1), (2), (5), (8) and 2511 (b). This Court disagrees.

DHS became aware of J.L.B. on October 31, 2017, when it received a General Protective Services (GPS) Report alleging that on October 31, 2017, seven year old J.L.B., was referred by school staff to Children's Hospital of Philadelphia (CHOP) because she was limping and in pain and she told them R.M., hits her on her legs with drumsticks when she fails to do her chores. DHS observed a bruise and linear marks on the backs of her legs. J.L.B. was diagnosed with recent extensive bruising and old linear

18

hyperpigmentation on the backs of her legs; the Children's Mother, A.M., told CHOP staff that, since around October 24, 2017, J.L.B. had jumped on a glass table with other children from church, had been hit repeatedly with a bat by another child, and fallen down steps. (CPS Report, 10/31/2017, Exhibit DHS 4).

On November 13, 2017, Mother gave birth to S.M. (Exhibit "B" *Certification of Birth*, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/31/2020).

On November 15, 2017, DHS obtained an Order of Protective Custody (OPC) for J.L.B. and removed her from the home of her Mother and Stepfather, R.M. On December 26, 2017, DHS indicated the Child Protection Services (CPS) Report naming Mother and R.M. as perpetrators of abuse for causing bodily injury to a child through a recent act or failure to act (Exhibit DHS-4).

On November 16, 2017, this Court transferred legal custody of both Children to DHS and placed them in Foster Care through Children's Home of Easton. (Shelter Care Orders, 11/16/2017).

On March 14, 2018, this Court adjudicated J.L.B. Dependent and found her to be the victim of child abuse as defined by 23 Pa.C.S. §6303 and the perpetrators were found to be Mother and Stepfather, R.M. (Order of Adjudication and Disposition, 3/14/2018).

On June 27, 2018, this Court adjudicated the seven-month-old Child, S.M., Dependent and legal custody remained with DHS, and placement continued in Foster Care through Children's Home of Easton. (Order of Adjudication and Disposition, 6/27/2018).

19

On October 23, 2018, William Russell, Ph.D., licensed Psychologist conducted a court ordered Parenting Capacity Evaluation (PCE) on Mother and Father, R.M., to assess their ability to provide safety and permanency for the Children. He interviewed Mother and reviewed available records. Mother reported, "everything was fine and then DHS called out of the blue. I told them that if this was about what happened at CHOP, then it's a misunderstanding." Mother reported she, R.M., and the J.L.B. were interviewed by DHS and that J.L.B. disclosed that R.M. hit her with drumsticks. Mother denied that R.M. ever hit the Child with drumsticks. During the interview Mother denied a history of arrest or other legal involvement. Mother did not indicate any employment history and reported she was currently enrolled at Pierce University to earn her MBA. Dr. Russell deferred diagnosis and recommended that the family should participate in Family Therapy, focusing on understanding the Children, encouraging appropriate emotional express and assist R.M. in understanding the development of children. Family Therapy should commence prior to the consideration of Reunification of J.L.B. based on the nature of the relationship between this Child and R.M. R.M. to participate in classes to learn appropriate ways to discipline. Visitation with J.L.B. and R.M. should progress at the direction of the Family Therapist. (Report of Forensic Evaluation by William Russell, Ph.D., 10/23/2018) (Exhibit, DHS-21).

On May 8, 2019, this Court held a Permanency Review Hearing and Mother testified she attended the PCE with Dr. Russell on 10/23/2018, and that she did not read the entire Report but just went to the back of it to see what the doctor had recommended. When questioned about page 5 of the Report, " [Mother] ▓▓▓▓▓ denied a history of arrest or other legal involvement", Mother stated that she did not lie to him, but he asked her only

20

in regards to child abuse, and responded, "why am I going to give any additional information if we're here on child abuse?" Mother then proceeded to acknowledge that she was arrested in Kansas on 6/8/2008, and 6/12/2008, and stated she paid the fine. Mother also acknowledged that she was arrested on 12/16/2010, for battery against a law enforcement officer and obstruction and sentenced 2/10/2011 to a one-year Probation. Mother testified "the PCE was pertaining to child abuse, so if you're asking me a question in regard to child abuse and to what's going on, why am I going backwards when you're not asking me any of that history? You're asking me what happened to my child? How did I end up here?" When questioned by this Court whether Dr. Russell had made an error when he indicated in his Report that she answered "no" as to historical criminal charges, Mother responded, "Well, he didn't ask me about my prior history." (N.T., 5/08/2019, p.49 at 7-10, p.50 at 1-18, p.51 at 12-25, pp.52-54 at 1-25, p.55 at 1-15, p.56 at 1) (Exhibit, DHS-22).

Mother also testified on 5/08/2019, that she was employed and had gotten a raise in pay, whereupon, DHS later discovered that Mother's last day of employment was 10/05/2018, as per a Human Resources Letter from CENLAR, dated 10/21/2019. Patrice Garvey, CUA Supervisor from Turning Points for Children testified on 5/08/2019 that Mother refused to provide a copy of her social security card and had not provided pay stubs in more than six months. Mother claimed she and her husband, R.M., were victims of identity theft and she would send it through her attorney. Ms. Garvey never received it from Mother nor her attorney. (N.T., 5/08/2019, p.80 at 13-25, p.81 at 1-24, p.82 at 1-16) (Exhibit DHS-18).

At the Permanency Review Hearing on August 28, 2019, this Court heard Expert testimony from William Russell, Psychologist, who conducted Parenting Capacity Evaluations (PCE) on Mother and Father, R.M., on October 23, 2018. He testified that at that time he concluded there were concerns regarding the safety of the Children and that there were a number of recommendations that should be followed. He noted that he was provided a copy of the Notes of Testimony from a hearing held on May 8, 2019, which he reviewed. He noted that he became aware that Mother and Father, R.M., has separated and no longer lived together. He was also aware that Mother and Father, R.M. obtained Protection From Abuse Orders against each other subsequent to the May 8, 2019 hearing. (N.T., 8/28/2019, p.8 at 16-25, pp.9-11 at 1-25, p.12 at 1-24, p.13 at 1-3).

Dr. Russell testified that based on the noted new information he obtained, he had changed his opinion as to the parents since his initial PCE's. With regards to the parent R.M., he stated the information provided at the initial evaluation was in direct contrast to the information that was evident in the May 8, 2019 hearing. Quite a number of aspects of R.M.'s life that he presented to Dr. Russell were refuted during the subsequent May 2019 hearing. And because of that, any opinion that he gave regarding R.M,. as a result of the October 23, 2018 evaluation and the information he was given, that initial opinion would not be valid. He noted that it did not make a difference that the parents were physically separated. He testified that much of the information provided to him by Mother and R.M. was later found to be inaccurate or false. Both parents used almost the exact same wording to describe what occurred during the evaluation process. That reflected that the two of them were sharing information and were practicing whatever they were going to say to the Court. (N.T., 8/28/2019, p.13 at 4-25, p.14 at 1-22).

22

Dr. Russell testified that his opinion that Mother and Father, R.M., were not able to provide safety at the end of evaluation would still stand, unless he was shown something dramatically different from one of the parents. He noted that if he was redoing an evaluation, clearly all of the information that was demonstrated to be of questionable accuracy, clearly false information, would need to be provided to him. He believed both parents were lying to him at the initial PCE and they were coordinating their misrepresentations. He testified that if a new PCE was scheduled for Mother, the basic opinion would not change. What would change would be the length of time that he would recommend that was needed to see stability on the part of the Mother. His opinion would be significantly different if Mother was able to provide documentation, provide proof of all the different things that were not accurate, and then demonstrate that she had an independent way of supporting herself or providing housing, that could begin to get into possibly changing his opinion on Mother. (N.T. 8/28/2019, p.15 at 2-25, p.16 at 1-21).

At the conclusion of this hearing, this Court ordered Mother and Father, R.M., resubmit for PCE to expedited and to include Minnesota Multiphasic Personality Inventory. This Court stated, "the reason behind that is that one of the primary issues here is deception. And having been able to see the results of MMP's in the past, they have a potential for providing the level of deception that the parties are engaged in. It's not the absolute proof as such, but it's one of the tools used, and the Court, as finder of fact could use in determining whether or not the parties are deceptive, in whole or in part." (N.T., 8/28/2019, p.17 at 3-16) (Permanency Review Order, 8/28/2019).

On January 20, 2021, this Court began the virtual Goal Change/Termination of Parental Rights Hearing for both Children and heard further Expert testimony from William Russell, who conducted a second Parenting Capacity Evaluations (PCE) on Mother on January 3, 2021. He testified that based on the hearing in August 28, 2019, when he testified before the Court, it was ordered that a reevaluation should be conducted based on significant information that was conflicting regarding the statements made by both Mother and Father. Dr. Russell testified that Mother told him that she had been under duress during the time she was with R.M., and that statements she had made to him at the first evaluation were false. Mother felt she was forced to make those statements out of fear of R.M.'s retaliation. He met with Mother in January 2020 and July 2020 to conduct the second PCE and there was a significant amount of information, in light of the conflicting history of the case. Therefore, his Report was completed and dated on January 3, 2021. (N.T., 1/20/2021, p.177 at 12-25, p.178 at 1-25, p.179 at 1-4, p.180 at 1-14) (Report of Forensic Evaluation, 1/03/2021).

Dr. Russell testified that Mother discussed her relationship with R.M., and she described the physical abuse of J.L.B. and herself by R.M. He noted that in light of the history of the case, in the light that would be multiple presentations of information with distortions by both individuals in this case; changing stories, changing presentations was a fairly frequent occurrence. He does not know what Mother told the CUA workers, however, she was quite clear to him that she was physically abused and felt threatened by R.M. on multiple occasions. He opined he did not see signs of post-traumatic-stress syndrome, but he did see a slight elevation in anxiety during her presentation of material. He did not see any symptoms of a trauma related response, neither did a trauma related

24

response become evident from psychological testing on Mother. (N.T., 1/20/2021, p.187 at 6-16, p.188 at 6-25, p.189 at 1-7).

Dr. Russell asked Mother why she was not truthful during her first PCE, and she responded that most of the information she provided him was false and that she was forced to provide that information by R.M. She described that the day of the original evaluation he accompanied her and threatened her on that day. He opined that Mother's presentations for the subsequent PCE was much more in line with a truthful presentation. Mother described a number of events and reactions. There were discrepancies, but he cannot say whether they negated her story. Everything that he reported in his written Report such as Mother living in Chester, pays the rent there, she is on disability, she is in therapy, were all verified and so they were truthful. (N.T., 1/20/2021, p.191 at 23-25, p. 192 at 1-25, p.193 at 1-9).

Dr. Russell testified Mother told him she was engaged in therapy with Dr. Silberman. He received three pieces of information from him: 1) a general statement letter that he was treating Mother; 2) his treatment plan; and 3) his CV. He noted that the treatment plan was undated and unsigned. He noted this was highly unusual because this document would not meet basic insurance regulations because it must be signed by the Care Giver and the Patient and dated with both a start date and expiration date. He further stated that he did recommend that Mother attend individual mental health therapy to deal with reported trauma, such as a mix of insight-oriented treatment combined with reality therapy. Based on what he received from Dr. Silberman, he could not determine whether Mother was receiving those types of therapies. (N.T., 1/20/2021, p.196 at 19-25, p.197 at 1-25, p.198 at 1-16).

Dr. Russell testified that Mother told him that she could balance running her nail salon in her home with having the Children in her care if she was reunited with them. When he questioned her with more details, Mother became flustered and had significant difficulty providing any concrete responses. Mother stated at one point that she could take the Children to her Aunt in Philadelphia. She also said she could put one child in daycare, but overall, Mother had not thought through the details and that raised concerns about her overall presentation, her immaturity, naivety and her limited ability to think ahead for potential problems that she might face having the Children back in her care. Mother also failed to offer any insights into the cause of J.L.B.'s injury and although she did not allegedly inflict the abuse directly, Mother knew it occurred. That Mother knew the Child was injured and still did nothing. Mother just does not have an understanding that it's her responsibility to protect the Child. Dr. Russell also has concerns about Mother's mental stability and her consistency with providing accurate information. (N.T., 1/20/2021, p.200 at 21-25, pp.201-203 at 1-25).

In his Report dated 1/03/2021, Dr. Russell discusses the MMPI-2RF test results for Mother. He wrote this test allows the administrator to make inference about the client's behavior and way of thinking. He noted Mother's score on the Variable Response/Inconsistency Scale (VRIN) was quite unelevated. This suggests that she was clearly able to read and comprehend the test items and that she was attentive in considering her responses. Therefore, Mother's elevated score on scale L, (Lie scale) cannot be attributed to an inability to understand the content of the items presented. This absence of substantial elevation on the VRIN together with no elevation on the fake bad scale (fbs and ds) suggest that her elevation on scale L was a deliberate attempt to appear

26

without faults. Mother's clinical results are similar to individuals who are often described as being suspicious of others and their motives. They see malicious intent in the action of others and often blame others for their difficulties. Their mistrust of others can cause difficulties in interpersonal relationships: thus, these individuals are often alienated from others. (Report of Forensic Evaluation, 1/03/2021, p 6-7, Exhibit DHS-20).

Dr. Russell also corresponded with Amber Walsh, J.L.B.'s therapist, who noted that the Child is exhibiting significant fear and anxiety about Mother's ability to protect her. He opined this indicates the need for ongoing therapeutic interventions to address these issues prior to reunification with Mother. Clearly J.L.B., has demonstrated that while she cares for her Mother, she still struggles with why she wasn't protected by her Mother. He noted that Mother has never been an essential caretaker for both of the Children together. (N.T., 1/20/2021, p.204 at 20-25, p.205 at 1-20).

On cross-examination by Elizabeth Flanagan, Child Advocate/GAL, Dr. Russell opined that Dr. Silberman does not mention a trauma reaction, nor does he mention any symptoms consistent with a post-traumatic stress disorder. He noted that Mother has never served as the Primary Caretaker for both Children. When you take the history of J.L.B.'s physical abuse, the separation, the issues of trust, combined with a three-year old who really has not known Mother as her essential caretaker for any of her life, concerns would be increased as to Mother with the responsibility of caring for two Children. (N.T., 1/20/2021, p.212 at 9-25, p.213 at 1-10).

This Court also heard persuasive, credible testimony from Nicole Beauchamp, Foster Care Worker from Children's Home of Easton (CHOE). She stated she is the

27

liaison for children that are in foster care as well as for the foster families, the Agency and the biological families. She began working with the J.L.B. and S.M. and the families in September 2018, and she supervised visits between the Children and the parents. The visits were twice a month and she supervised until June of 2019, when Mother and R.M. separated and the visitation schedule changed. (N.T., 1/20/2021, p.26 at 17-25, pp.27-28 at 1-25, p.30 at 16-18).

Ms. Beauchamp testified she supervised visits between Mother and the Children twice a month at CHOE for two and a half years. Mother generally arrived on time and stayed the two-hour time limit. She would bring them food and engage in activities which were pretty positive. The Children were always happy to see her, and both identify her as their Mother. During the Pandemic, visits changed from in-person to virtual and they also occurred twice a month. Mother also telephoned to speak to the Children one to three times per week prior to the Pandemic, however, J.L.B. expressed that during the Pandemic her contact with her Mother was limited outside of her virtual and in-person visits. The Child recalled maybe two times between June 2020 and November 2020 that she spoke to Mother on the phone. (N.T., 1/20/2021, p.39 at 1-25, p.40 at 1-3, p.41 at 10-25, p.42 at 1-2, p.43 at 1-13).

Ms. Beauchamp further testified she has observed the interaction between the two Children and their current foster care parents. She noted that the relationship is very positive. J.L.B. expressed to her that she likes living with the foster parents very much and they are willing to adopt the two girls. She feels they love her very much and are a good support system for her. She gets along well with her three foster siblings and feels safe there. The two sisters, J.L.B. and S.M. are very attached to each other and have

28

spent most of the time together. J.L.B. has expressed she does not want to be separated from her sister under no circumstances. (N.T., 1/20/2021, p.44 at 7-25, p.45 at 1-25, p. 46 at 1-11).

Regarding J.L.B.'s relationship with her Mother, Ms. Beauchamp testified the Child has expressed to her that she loves her Mother, however, the past two and a half years the relationship has been rocky. The Child has been hurt because Mother's communication with her has been inconsistent. J.L.B. told her that she is not sure what living with her Mother would be like and if given the opportunity to stay where she is at, she would want to do that. Ms. Beauchamp stated her last conversation with J.L.B. was in December 2020 and the Child's view has remained consistent. (N.T., 1/20/2021, p.46 at 12-25, p.47 at 1-24).

Ms. Beauchamp testified she has supervised two visits between Mother and J.L.B. since the last hearing when she testified and stated Mother's visitation schedule remained as biweekly, supervised at the Agency for two hours. Mother requested a change in schedule because of her work and instead of in-person visits the visits were going to be virtual, which would be four visits totaling seven weeks. There was difficulty scheduling the virtual visits, she told Mother she was doing her best to accommodate Mother's change in schedule. Two in-person visits occurred with both Children on 2/12/2021 and 2/17/2021, both visits were unremarkable, and she did not have to provide any redirection. She noted that the Children were at times emotional and have expressed that they miss their Mother and they enjoy spending time with her, but they're not crying at the end of the visit because they want to go home with her. (N.T., 4/22/2021, p.276 at 21-25, pp.277-282 at 1-25, p.283 at 1-7, p.284 at 1-13).

Amber Walsh, Therapist at CONCERN Behavioral Health, was next to testify. She stated she began working with J.L.B. as her direct clinical therapist on August 15, 2020. She meets with the Child every Monday at her school on a weekly basis and sometimes meets with her biweekly on Thursdays at the office. Ms. Walsh testified she works with the Child on advocating for herself, emotional regulation and processing through trauma. (N.T., 1/20/2021, p.58 at 22-25, p.59 at 1-25, p.60 at 1-21).

Ms. Walsh testified that during therapy sessions she has spoken to J.L.B. about the physical abuse she has endured by her Mother and Stepfather. She noted the Child has made progress in talking to her and relaying information about her trauma. Regarding her Mother, J.L.B. has done a lot of art therapy regarding the differences between her home life with Mother and her home life with her Foster Parent, where she resides with her sister. (N.T., 1/20/2021, p.60 at 22-25, p.61 at 1-25, p.62 at 1-16).

Ms. Walsh testified the Child feels unsafe and angry with her Mother because she did not protect her. J.L.B. has related to her that she wants to be adopted. She has stated that to her at least three times, the last time being last Monday, 1/18/2021, and the Child has not waivered at all about desiring to be adopted. Ms. Walsh opined that J.L.B. would not suffer irreparable harm if Mother's parental rights were terminated. The Child would suffer irreparable harm if she was removed from the Foster Parent's home. (N.T., 1/20/2021, p.64 at 1-25, p.65 at 1-22, p.66 at 1-8).

On cross-examination by Elizabeth Flanagan, Esquire, Child Advocate/GAL, Ms. Walsh testified that she is not currently recommending that J.L.B. and her Mother engage in Family Therapy. She has reviewed the notes from the previous therapist and has also discussed the matter with the Child, and she recommends the focus be on J.L.B.'s

30

individual growth before introducing another participant into her sessions. Ms. Walsh opined that Family Therapy with her Mother, or her Father would not be productive for the Child at this time. It would make her regress in her treatment and individual growth. She noted that she has worked with the Child approximately five months now and they have developed a consistent and significant relationship together to make that recommendation. She also noted they have check-ins at school, where she is stationed four days a week, and J.L.B. has requested to speak with her and engages in sessions, far different from the beginning when she was withdrawn and closed off. Ms. Walsh opined the Child has really progressed. Regarding her relationship with her Mother, if she is adopted, J.L.B. expressed to her that she wants her Mother to work on her goals and she was fine with not being able to talk to her Mother. (N.T., 1/20/2021, p.69 at 10-25, pp. 70-71 at 1-25, p.72 at 1-10, p.74 at 17-25, p.75 at 1).

Ms. Walsh testified credibly and persuasively again at the hearing on April 22, 2021 and stated she has been treating J.L.B. for approximately eight months. She had sessions with her 4/12/2021, 4/15/2021 and 4/19/2021 and J.L.B. described three emotions she feels towards her Mother that she expressed during therapy: angry, sad, and lacking trust. Ms. Walsh noted that the lack of trust comes for the fact that the Child believes that her Mother picks men over her children. Her professional opinion, sadness comes out when the Child talks about process of going home, the fears that she has with going home and not feeling safe and protected. She noted that fear has remained consistent over the last eight months. Ms. Walsh again stated the Child continues to say that she wants to stay with her Foster Family. She again opined that the Child would not suffer irreparable harm if Mother's parental rights were terminated because of the

31

bonding that she has with her Foster Parent. She stated that taking J.L.B. out of that attachment with her Foster Parent and away from that bond can only regress her in her mental health treatment. (N.T., 4/22/2021, p.17 at 10-25, pp.18-20 at 1-25, p.21 at 7-25, pp.22-23 at 1-25, p.24 at 1-18).

Ms. Walsh testified she has had telephone conversations with Mother every week since the last court date in January 2021. She has not initiated any formal Family Therapy between the Child and her Mother because the Child was not ready for Family Therapy and has expressed that she was not willing to do that. Mother has participated in journaling back and forth with the Child, specifically the "Mommy and Me Journal." However, the Child struggles to believe that Mother has made changes. Ms. Walsh opined that it would be very hard to repair the relationship between the Child and Mother. (N.T., 4/22/2021, p.26 at 1-20, p.43 at 22-25, p.44 at 1-7, p.50 at 14-20).

Maribeth Younger, a private Mental Health Therapist also testified before this Court. She was Therapist for J.L.B. beginning in July 2018 when the Child's Mother made the arrangements through her personal insurance. She noted that although Mother lost her insurance coverage, she continued with the therapy sessions with the Child. She described the Child as a delightful young lady who disclosed a lot of sensitive information to her. She noted that she wanted to make sure the Child has a support system as she was transitioning through the Foster Care system and that is why she continued to provide services. (N.T. 4/22/2021, p.122 at 21-25, p.123 at 1-25, p.124 at 1-5, p.127 at 1-13).

This Court heard credible, persuasive testimony from Patrice Garvey, CUA Case Manager Supervisor. She testified one of the PCE recommendations for Mother was for

32

her to obtain individual therapy. She reached out to Dr. Silberman, whom Mother was treating with, through a telephone call on 12/29/2020 and 12/31/2020. She requested progress, treatment and attendance reports. She told Mother's therapist that Mother was found by the Court to be a perpetrator of child abuse as to J.L.B., and he responded that he was unaware of the fact. (N.T., 4/22/2021, p.225 at 14-25, p.226 at 1-25, p.227 at 1-23).

This Court heard Expert testimony from Dr. Alan Silberman, Psychologist, who stated he has been treating Mother for over a year and has seen her once a week for at least 50 times in that period. He stated the case came in because of the identification of what appeared to be child abuse, with injuries to J.L.B. in particular and the physical and emotional safety of the Child plus the home environment. (N.T. 4/22/2021, p.63 at 6-25, p.64 at 1-21).

Dr. Silberman was questioned by Ms. Schiffman, attorney for DHS regarding a letter he wrote June 11, 2020, after treating Mother for approximately two months. The letter noted, "she has been treatment compliant and consistent and quite sincere in her efforts to better understand herself and her interactions with others around her. ⬛. [mother] ⬛ appears to have been successful in overcoming feelings of abuse and distrust that emerged from her dysfunctional marriage. She is handling the divorce process well and is looking forward to resuming her role as a nurturing and devoted parent. I believe she is emotionally equipped to independently parent her Children. She is clearly capable of being an excellent role model for her Children. I recommend that she have full custody of her Children. It is also recommended that she continue individual counseling/therapy to help her with the normal stresses associated with reorienting to a new and independent

life as a single parent." (N.T., 4/22/2021, p.81 at 7-25, p.82 at 20-25, p.83 at 1-7, (Exhibit-M-7).

Dr. Silberman was then asked if he recalled writing the letter on June 11, 2020, where he recommended Mother have full custody of her Children and he responded that he did recall writing that. When questioned whether he recalled if the CUA Case Manager had told him that Mother had been found by the Court as perpetrator of child abuse, he responded, " I believe I did know that she...that was one of the issues. When I talked to her, after the first few sessions, I indicated she became quite candid with me, and these were the issues that were present...I don't know about the formal charges." Dr. Silberman then stated he couldn't tell the Court exactly when he found out about the child abuse, "I can't tell you exactly. It was after several session that she developed confidence in me and sense of trust. It had to be before the letter." Dr. Silberman was then asked by the Court if he was aware that the adjudication of the J.L.B. as Dependent and the finding of child abuse against Mother had occurred in 2018, he responded, "yes...I don't recall if at the time that I wrote the letter, I was aware of the dates...I wasn't treating her ....she came in because of anxiety and depression and this came up..." (N.T., 4/22/2021, p.83 at 1-21, p.84 at 1-13, p.88 at 6-23).

Dr. Silberman testified he disagreed with Dr. Russell's statement in the PCE on page 8, where he stated Mother continues to offer no insight into the cause of J.L.B.'s injuries. Stating, " I was aware that he said that, and I was aware of it because I thought it was absurd." (N.T., 4/22/2021, p.94 at 22-25, p.95 at 1-5).

Finally, Dr. Silberman testified, "I was not involved in the legal case at all. She came to me because of anxiety and depression. This came up as part of the overall

dynamic. My responsibility was her mental health, her emotional well-being. She came to me voluntarily. This was not—to the best of my knowledge, this was not court-ordered to come to me. And when people come, I have to accept the sincerity of intent, unless there's secondary gain. And, I didn't see that as secondary gain to want to be able to function and go from being depressed and anxious to being able to use one's resources." This Court then asked Dr. Silberman, "notwithstanding all of that, you injected yourself into this case by recommending that Mother be awarded full custody of both Children; am I correct in that—in June of 2020?" He responded, "Yes...because I was asked to do that...I did not volunteer for the case." (N.T., 4/22/201, p.99 at 1-25, p. 100 at 1-14).

This Court questioned Dr. Silberman whether he considered the use of objective testing on Mother for the purpose of discerning whether or not a person has a deceptive personality, and he responded, " I think testing can be very helpful in terms of understanding personality. I didn't feel that it was appropriate...I understand and agree with you in terms of the usefulness in many cases" This Court then asked him, "why didn't you use it here, and he responded, I didn't feel that it was necessary here." (N.T., 4/22/2021, p.117 at 14-25, p.118 at 1-25, p.119 at 1-25).

On cross-examination by Elizabeth Flanagan, Esquire, Dr. Silberman opined, " My belief is that people can change, and I believe [Mother] in particular—I don't know the other people in the scenario, but I believe [Mother] has made noteworthy, significant change, and that the Children would be safe with her." (N.T., 4/22/2021, p. 107 at 6-10).

35

Mother testified she has been employed at Bank of America since January 2021 and that she informed the CUA team. Mother stated she has been in full compliance with her SCP objectives. Mother also stated that she has taken full responsibility for the child abuse inflicted by R.M., and for her not speaking up about it because of her fear. Mother testified she should have not operated on fear and been able to come forward and tell what happened and be able to express that. (N.T., 4/22/2021, p.334 at 20-25, p.338 at 9-25, p.339 at 1-25, p.340 at 1-19).

Mother testified she began therapy with Dr. Silberman in April 2020, and has gained some confidence, and is not operating on fear, using her voice, and she is severing all the ties with the things that she needed to do. She stated she has been able to move forward. She noted that she is in the process of obtaining a divorce from R.M. and does not have any direct contact with him. (N.T., 4/22/2021 at p.341 at 2-25, p.342 at 1-9).

Mother stated she has to regain the trust with her eldest daughter and plans on doing that through therapy, taking her time, not rushing the process and allowing them to rebuild something that is solid for her and her Children. She is willing to do Family Therapy with J.L.B. and has discussed that with Ms. Walsh. Mother stated it was disheartening to her that her daughter is declining therapy with her at this time. (N.T., 4/22/2021 at p.342 at 19-25, pp.343-344 at 1-25, p.345 at 1-7).

This Court finds the Expert testimony of Dr. Russell, the testimonies of Nicole Beauchamp, Foster Care Worker from Children's Home of Easton (CHOE), Amber Walsh, Therapist at CONCERN Behavioral Health, and Patrice Garvey, CUA Case Manager Supervisor, to be clear, convincing and persuasive.

36

This Court gives little weight to the Expert testimony from Dr. Alan Silberman, Psychologist, who treated Mother. After less than two months of one-hour weekly sessions, with little or no knowledge of the facts of this case, Dr. Silberman opined in a letter that Mother should have full custody of her Children. His opinion at the hearing on 4/22/2021 remained the same, he opined that Mother has changed and that the Children would be safe with her. This Court disagrees.

Mother has lied and manipulated information to Therapists and Social Workers. In fact, this Court ordered a secondary PCE because of the blatant dishonesty of the Mother at the first PCE. Dr. Russell testified that Mother's elevated score on scale L, (Lie scale) cannot be attributed to an inability to understand the content of the items presented. He stated these results suggests that Mother's elevation on scale L was a deliberate attempt to appear without faults. Mother's clinical results are similar to individuals who are often described as being suspicious of others and their motive. They see malicious intent in the action of others and often blame others for their difficulties. Their mistrust of others can cause difficulties in interpersonal relationships: thus, these individuals are often alienated from others. This Court finds Mother's testimony not credible and the level of deception is so clearly refuted by the physical evidence that this Court must question everything Mother says or does.

This Court finds that DHS has provided clear and convincing evidence Mother continues the incapacity to parent. She lies and manipulates information and lacks the ability to anticipate problems related to parenting. She may have decided to terminate the abusive relationship with R.M. and may be on the path to a better life, nonetheless her daughter has clearly expressed she does not feel safe with Mother. Mother's conduct has

37

caused these Children to be without essential parental care and she continues to be unable or unwilling to remedy this incapacity. These Children have been out of the parental home for more than six months and the conditions that led to the removal and placement continue to exist. Mother has complied with some FSP objectives, but whether she can remedy the conditions which led to the removal of the Children in the foreseeable future is doubtful. The Children's lives cannot be placed on hold in the hope that Mother will summon the ability to handle the responsibilities of parenting. This Court finds that although the Children may have a bond with Mother, this bond however is not a parent-child bond that should be preserved.

This Court finds the termination of Mother's parental rights would best serve the needs and welfare of these Children and the evidence shows that DHS met its burden by clear and convincing evidence to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. §2511 (a)(2), (5) (8) and 2511 (b).

**Trial Court Properly Found that the Goal Change from Return to Parent to Adoption was in the Child's Best Interest and the Court's Disposition was Best Suited to the Safety, Protection and Physical, Mental and Moral Welfare of the Child Pursuant to 42 Pa.C.S.A. §6351 (f.1) (2).[3]**

The concept of a "goal change" is consistent with the statute which requires the trial court, at the conclusion of a permanency hearing in a child dependency proceeding, to order the continuation, modification, or termination of placement or other disposition which is best suited to the safety, protection and physical, mental, and moral welfare of

---

[3] **42 Pa.C.S.A. §6351-Disposition of dependent Child.—(f.1). Additional determinations.** Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following: (2) If and when the Child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the Child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the Child.

38

the child; an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal. 42 Pa.C.S.A. § 6351(g).

This Court heard credible, persuasive testimony from Ms. Beauchamp who testified she has observed the interaction between the two Children and their current Foster Care Parents. She noted that the relationship is very positive. J.L.B. expressed to her that she likes living with the Foster Parents very much and they are willing to adopt the two girls. She feels they love her very much and are a good support system for her. She gets along well with her three Foster siblings and feels safe there. The two sisters, J.L.B. and S.M. are very attached to each other and have spent most of the time together. J.L.B. has expressed she does not want to be separated from her sister under no circumstances. (N.T., 1/20/2021, p.44 at 7-25, p.45 at 1-25, p.46 at 1-11).

Regarding J.L.B.'s relationship with her Mother, Ms. Beauchamp testified the Child has expressed to her that she loves her Mother, however, the past two and a half years the relationship has been rocky. The Child has been hurt because Mother's communication with her has been inconsistent. J.L.B. told her that she is not sure what living with her Mother would be like and if given the opportunity to stay where she is at, she would want to do that. Ms. Beauchamp stated her last conversation with J.L.B. was in December 2020 and the Child's view has remained consistent. (N.T., 1/20/2021, p.46 at 12-25, p.47 at 1-24).

Ms. Beauchamp further testified she last saw the Children at the Foster Home on 4/19/2021 and spoke privately with J.L.B. about her relationship with the ⬛ [foster parents], the Foster Parents. The Child told her she was comfortable being with them and she wants to

39

remain with them. She has a good relationship with both Foster Parents and sees them both as her primary set of parents. The Foster Parents have three biological children, ages 16, 14, and 8 years old, and the Child and her sister, S.M., fit right in together. Ms. Beauchamp testified the Foster Parents want to adopt both Children. (N.T., 4/22/2021, p 286 at 3-25, pp.287-289 at 1-25, p.290 at 1) .

Ms. Walsh testified that when the Child speaks of her Foster Parent, she is more engaged with the conversation and expresses emotions of happiness, feeling safe and but also feeling sad. The Child is happy because her Foster Parent helps her with her homework and they have family time, movie nights and she gets along well with everyone at the house. She noted that when the Child speaks of her Mother her body language is very withdrawn, her head is down, and she does not make great contact with her. When the Child speaks of her Mother's home, she feels unsafe and angry. (N.T., 1/20/2021, p.62 at 17-25, p.63 at 1-24).

Ms. Walsh testified the Child feels unsafe and angry with her Mother because her Mother did not protect her. J.L.B. has related to her that she does want to be adopted. She has stated that to her at least three times, the last time being last Monday, 1/18/2021, and the Child has not waivered at all about desiring to be adopted. Ms. Walsh opined that J.L.B. would not suffer irreparable harm if Mother's parental rights were terminated. The Child would suffer irreparable harm if she was removed from the Foster Parent's home. (N.T., 1/20/2021, p.64 at 1-25, p.65 at 1-22, p.66 at 1-8).

Ms. Garvey testified J.L.B. was placed with the [Foster parents], the current pre-adoptive family on 6/21/2019. On or about January 2020, the Child told her she wanted to remain with the [foster parents] because she felt safe and wanted to be adopted by them. The Child stated

she did not want to go back home to her Mother because she did not feel safe because her Mother did not stop the beatings. (N.T., 4/22/2021, p.232 at 13-25, p.233 at 1-25, p.234 at 1-16).

Ms. Garvey also testified she supervised some of the virtual visits between Mother and the two Children in March 4, and March 19, 2021. The visits were virtual instead of in person because of the Mother's work schedule and how it conflicted with visitation times at Children's Home of Easton. So, it was decided Mother could do virtual visits for approximately six weeks because it corresponded with Mother's work schedule. They were FaceTime group visits and Mother showed the Children her home and the bedrooms she had set up for them. They painted and played games. She stated the visits went well, however, she felt Mother was misleading the Children by telling them they would be coming to her home soon. On March 24, 2021 she did a home visit with Mother that did not involve the Children. She noted that J.L.B. is very protective of her younger sister, S.M. , and has a big sister-parent relationship with her. She keeps an eye on her and they have a loving bond together. (N.T., 4/22/2021, p.234 at 17-25, p. 235 at 1-25, p.236 at 1-15, pp.237-238 at 1-25, p.239 at 1-23).

Ms. Garvey testified she spoke to J.L.B. on 4/21/2021, and the Child told her that she wants to remain with the Foster Parents, feels safe there and wants to be adopted by them. She wants to remain with her sister and feels like the [Foster parents] ██████ are her parents and wants to remain with them. She told her returning to Mother's home was not what she wanted. She opined that the Children would not suffer irreparable harm if Mother's parental rights were terminated and it would be in the Children's best interest to be

41

adopted. S.M., who is 3 ½ years old has never lived with her Mother and has been in care since her birth. (N.T., 4/22/2021, p.242 at 6-25, p.243 at 1-25, p.244 at 1-14).

This Court heard credible, persuasive testimony from Melanie Silverstein, Esquire, TPR Counsel for J.L.B., who is almost 12 years old. Ms. Silverstein had two conferences with the Child on 1/07/2021 and 4/19/2021, and her requests both times remained the same: to remain living with her sister in a safe house and that it would be with her Foster Parents, the Days. When she asked the Child about not seeing her Mother anymore, J.L.B. responded that she would still want to be with her Foster Parent, although she did not want to hurt her Mother's feelings. She further stated she did not want to testify in the courtroom because she did not want to talk in front of her parents. Ultimately, her position is that she wants to stay where she is, even if doesn't continue to have visits with her Mother or her biological Father. (N. T., 4/22/2021, p.439 at 19-25, p. 44 at 1-25, p.441 at 1-25, p.442 at 1-7).

This Court finds the Record sustains the factual findings and legal conclusions regarding the Children's current placement, and most importantly, the Record demonstrates that Reunification is not feasible and not in these Children's best interest. Competent, credible, persuasive evidence exists to change the Permanency Goals of the Children from Reunification to Adoption. Once Reunification is ruled out, the second preferred permanency option is Adoption. Adoption has been clearly established as the appropriate goal in the best interest of these Children and is best suited to the safety, protection and physical, mental and moral welfare of these Children.

## CONCLUSION

At the Hearing on 5/08/2019, this Court concluded:

> There are a number of things that are very troubling to the Court, and not the least of which is the lack of any credibility by Mother and Father; credibility throughout the history of this care; the attempts at deception; the attempts at concealment. Were it not for the diligence of DHS, we would have never been made privy to the fact that both Mother and Father, R.M., have this criminal history which they denied. And Dr. Russell would never have made the mistake of confusing criminal history with child abuse. I've had the doctor in front of me numerous times. That mistake is not believable. That presents another issue to the Court. And that is, given the parents' level of deception and dishonesty....strike this Court as so hostile to the issue of truthfulness, and the complete lack of transparency and honesty by the parties. Having had them before me on numerous occasions—in fact, I've had this case from the beginning—I am concerned now about their ability to be honest and forthright. And that complete lack of honesty present a safety issue to the Court. (N.T., 5/08/2019, p.95 at 11-25, p.96 at 1-14).

The Court Record shows that J.L.B. was the victim of repeated physical and emotional abuse while in Mother's care and Mother allowed it to happen. Mother has failed to protect J.L.B. and keep her safe in the past and this Court is not convinced Mother is capable of providing the protection necessary to keep both Children safe. Safety and loving care is essential to the growth and well-being of any child, and this Court cannot place these Children in an environment where their well-being and safety may be at risk. Perhaps Mother is on the road to recovery in her individual struggles, however, these Children's lives cannot be placed on hold to wait for Mother to perhaps acquire the skills necessary to provide a safe environment. Further, these Children have been placed in a loving, caring, nurturing home with the pre-adoptive Foster Family, and

43

this Court believes they deserve the opportunity to experience a loving, caring home where they are protected from harm. Therefore, this Court finds by clear and convincing evidence that DHS has met its burden and Mother's Parental Rights are Involuntarily Terminated. These Children's lives can now move to Adoption.

For the foregoing reasons, this Court respectfully requests that the Decrees of Involuntary Termination of Parental Rights of Mother, A.M. and the Goal Change to Adoption Orders issued by this Court on July 21, 2021, be **AFFIRMED**.

**BY THE COURT:**

**ALLAN L. TERESHKO, Sr. J.**

Oct 7, 2021

**DATE**

44